1-927 National Government Services v. United States Good morning, Your Honor. May it please the Court. Congress, in the MAC statute, twice commanded CMS to follow the FAR and CICA. The FAR and CICA provide the exclusive procedure I believe your challenge to the Jurisdiction 8 limitations is moot. I believe, Your Honor, to Jurisdiction 8 is moot, yes. Jurisdiction 8 is still alive. That's just a long housekeeping. Yes, Your Honor. But the FAR and CICA provide the exclusive procedures that CMS must follow So the main argument, the first argument here is whether or not this was fair and open competition. And you're saying it wasn't. We're saying that the exclusive way that CMS must engage and to manage the marketplace for MAC services in the manner they're attempting to do is FAR 6.202 and CICA at 41 U.S.C. 3303. That if they want, if the agency wants to manage the marketplace in the long Well, okay, the obvious question is why? What is it that you can point to that would limit it? But frankly, we're getting away from my question. My first question was just on the question of fair and open competition because the government maintains that's their main hook for this. Correct. So if there are circumstances where somebody competing is not going to make it because you need certain licenses at the end of the day in order to be awarded the competition. So that person, there's still full and fair competition even though at the end of the day a limited number of people are going to be excluded from getting the award. So presumably they may not even bother to apply. You wouldn't suggest that those criteria that might preclude someone from successfully trying to get a contract mean that there's not full and fair competition, right? Correct, Your Honor. We have no qualms. So why is this different? Just because at the end of the day there might be a certain criteria that's going to be applied that's going to preclude your client from getting the contract. Why does that bump into full and fair competition? Because in all of the cases that the government cites and that the Court of Federal Claims, the GAO, and the Federal Circuit have dealt with in that regard involve solicitation requirements that are designed to meet a technical need that the government has or something that goes to capability or performance. Across statutes, regulations, cases, full and open competition is presented as referring to a lack of discrimination in allowing submission of bids or proposals, right? No, Your Honor. That is the one statute read literally that the government provides. But if that were the case, FAR 6.202 would be read out of existence because FAR 6.202 says that if you want to exclude an offeror from an award in order to manage the broader marketplace, you must issue a DNF. You must issue a determinations and findings. Why should we ignore 41 U.S.C. 107? I don't think, Your Honor, that it would be ignoring 107. What you have to do is interpret 107 in light of 41 U.S.C. 3303 and FAR 6.202. Whatever it's... So how do we know that the exclusion under 3302 is the exclusive means by which the government can try to protect itself in terms of preserving competitiveness? So a few answers, Your Honor. Number one is that the MAC statute itself compels CMS to procure MAC services consistent with the FAR. The FAR, in turn, says if you want to manage the marketplace for services, then where you're concerned about the types of things the government is concerned about, that is to say the continuity of services or the competitive nature of the in a manner that would exclude a otherwise capable offeror from winning, then the means of doing so is to issue a determinations and findings. If that is not the case, then this court will write FAR 6.202 out of existence because you could always formulate a solicitation provision to accomplish the same end. That is something the government does not dispute here. What about the continuity exception? I mean, if that's construed broadly enough, then how does that affect... I'm back to the fair and open competition question. That is exactly the type of concern that FAR 6.202 is meant to address. The whole point is excluding a particular offeror, a particular source to, quote, increase or maintain competition or in 6.202A4, ensure, quote, the continuous availability of reliable supplies or services. So, that is exactly the case that FAR 6.202 is meant to address. Now, what the government says is that because there's this other FAR provision that says as long as it's not excluded, as long as it's not made unlawful, we can do this other means. But, of course, that would have the effect of reading any mandatory procedure out of existence unless the same FAR provision says that we can't accomplish this in any other way. That is not something that this Court has ever held applies to mandatory FAR procedures anywhere else. So, for example... We should be making the same argument today. It's my understanding that prior to adopting this workload cap in a very affirmative, almost binding way, granted there's discretion to not comply with it if necessary, but before that, didn't they actually have this as one of the factors they would nonetheless consider in deciding whether to award contracts to a particular person? Yes, Your Honor. In fact, in a 2010 memo that's in the record at Appendix 11842, which was again in 2010, CMS explicitly noted that they had considered these workload caps as kind of a blanket rule and decided to go with the case-by-case approach because they thought that the blanket rule would limit competition as it entered new FAR full and open contracting environment. So, but would you have the same argument today if instead of a hard-line cap, if instead this was just one of many things being considered, but if nonetheless it was one of the many things being considered, which in your case resulted in your client not securing the contract? If the government included as technical specifications a requirement that offerors addressed how an award would impact the general continuity of services or the competitive environment. Now, why do they have to do that? Why can't they just say sort of the small number of contracts you may have had could impact our decision to give it to you? Because under that, theoretically, you're not capable or we don't have enough confidence in your capability. Likewise, too many contracts being held by any one provider could impact our desire. I mean, it's, look, I'm an economist. It's useful to have lots of people producing goods and services. Monopolies, despite my love of patents, are inefficient in many ways. So what's wrong with the government wanting to spread around the contracts to ensure that one contractor doesn't have a computer crash, which brings down just an enormous number of government programs? Nothing at all, Your Honor, but in that kind of a case, the exclusive remedy for the government is in FAR 6.202. That is a mandatory procedure that if they want to exclude an offeror in order to maintain... Not exclude an offeror, but why can't they, could they have just taken this factor into account, as they used to do, I believe, in deciding whether or not to award a contract to an individual person who did, in fact, submit a bid? Right, but what they used to do in the case-by-case approach was assess the degree to which an award to a particular contractor, given all of the material in the offerors and the proposal record, could create that kind of risk. And that kind of risk is something that they can assess on a case-by-case basis. And if that were the case, if there were no bright-line rule, if all they were saying is, will NGS pose a specific risk in this procurement, then we would have no objection. That is the terms on which we are happy to participate in this procedure. Presumably, there's a rigmarole of procedures they have to go to, to make that assessment, right, which I have to assume is a practical matter, is the reason they tried to adopt the small-blank rule, right? That's exactly right, Your Honor. What they said in the record multiple times, and in the government's brief, is that they went to the blanket rule, the bright-line rule, if you will, because they said that they did not have the ability to make the record for the case-by-case exclusion or for the DNF, which is astounding confession, in our view, that because they didn't have the data or the underlying rationale to be able to make a case-by-case assessment, that the remedy for the government was to go more broad and limit competition even more. So if they couldn't survive a challenge under 6.202, that's what the government is effectively saying here, then this Court should not permit them to take an end-run around 6.202 by allowing them to include this and rewrite it as a solicitation provision. Well, CMS interacted extensively with industry in reaching this point, right? Correct. They tried different methods. They were seeking to obtain a competitive marketplace and still Yes, Your Honor. Why doesn't that by itself satisfy our deferential, very deferential, rational basis standard? Because the question isn't whether or not the caps are rational. The question is whether or not the agency was obligated to follow FAR 6.202, which is the implementing regulation for 41 U.S.C. 3303. And that statute and that regulation have specific steps that the agency must take in order to effectively exclude an offeror, an otherwise best value offeror. I mean, the record is clear that they take the position that the solicitation provision that effectuates the workload caps can eliminate us from the procurement, even if we, you know, where we are the number one, we are the otherwise best value selection. Even if it Almost all the discussion thus far has really been, I think, within the umbrella of whether or not this constitutes full and open competition. The government also argues that there are two provisions, statutory provisions in the MAC, which allow it to act contrary to full and open competition. Don't bother with the capability provision because they're going to get nowhere with me on that. But what about the other requirements provision, which I'll call the eligibility provision? The eligibility provision is expressed in 42 U.S.C. what, 1395 KK-1A2? D, yes. Yes, Your Honor. Thank you. Thank you for filling that in. But so there's this eligibility provision that permits CMS to impose other requirements for eligibility. Why isn't this a workload cap fairly within the umbrella of the other requirements the statute expressly allows them to adopt, even though it may curtail full and open competition? Because Your Honor, the way the workload caps are set up, we can still be at least according to the government, which is something that the government argued below to the trial court and the trial court agreed, was that the reason why it's full and open is because we can still compete and potentially still win. If that is the case, Your Honor, that means that we are capable by definition. There is no other way to, you're not allowed to perform a government contract unless there's a finding of responsibility and a finding of capability. It cannot be the case that if there's no one else that's responsible, we are suddenly capable. But if there is anyone else that's responsible, because of the caps, we are not capable. That makes no sense. You can't have kind of the springing capability that for some purposes we're capable and some purposes we're not capable. In addition, Your Honor. You'd agree that the government has a substantial interest in avoiding a situation in which one bidder captures the entire market. Yes, Your Honor. And that, the ability of the government to address that is squarely within 41 U.S.C. 3303 and FAR 6.202. But why isn't the government's argument a strong one that the eligibility criteria, and in particular this other requirements section, that they analogize, if I remember it right, this eligibility criteria to the conflict of interest eligibility criteria, which they also have the authority to waive. So you would think a conflict of interest would make you not eligible, and that's the general rule. But the provision expressly allows the government, in necessary circumstances, to waive that conflict of interest. And all this is expressed under the eligibility prong, right? I mean, this isn't the government just making up an analogy. These are actually expressed factors that have been adopted and discussed. And so why isn't this exactly like the conflict of interest, which can be waived? It's still an eligibility criteria, and you might not be eligible to get the award because you have a conflict of interest or because you have too many other contracts currently. But the government has the ability to waive either of those. I mean, that analogy feels really close to me. Your Honor, because in 41 U.S.C. 1395 KK 186 is where Congress said that the government must follow the FAR unless there is a specific requirement to the contrary. The OCI regulations of FAR Part 9 exist in the FAR, and there's no reason why the existence of the whole structure of FAR regulations, which allow the government to waive an OCI if it's in the best interest of the government, for example, does not compare to a case where the government is going to say, well, you're capable, you're eligible if there's nobody else, but you're not eligible if there is someone else, when, if you want to exclude us, you have FAR 6.202. I mean, you'd have to interpret the statute that Your Honor was talking about, the eligibility of entities provision, consistent with FAR 6.202. And what the government would have this Court do is view the broad statement in 1A2D as an implied repeal of FAR 6.202. Well, somehow, a FAR 6.202 and 41 U.S.C. 3303, there is no reason for this Court to do that. And there is every reason to believe the government, if they have the... Okay. So you've thrown a lot of little numbers and letters at me. Let me see if I get this right, because you're sort of discussing this at a level of assumption about my knowledge that is absolutely wrong. So let me just back it up. So are you saying the conflict of interest analogy breaks down because the FAR expressly articulates what happens in conflict of interest situations, and the FAR doesn't expressly articulate what happens in workload cap type situations similarly, and therefore, the overarching, you've got to follow the FAR unless something expressly tells you something different, governs here, even though it doesn't govern conflict of interest? I think I actually got your argument. Is that right? I think that's right, Your Honor. In other words, because... I mean, you used a lot of letters and numbers, but I think I got the gist of it. The MAC statute says you must follow the FAR unless there is a specific requirement in the MAC statute to the contrary. So the question is simply, why can't the... And are you saying there's an express statement with regard to conflict of interest, but there isn't one with regard to workload caps? Correct. The FAR contains all of the OCI provisions, including the waiver provision. So there's no reason why that can't be consistent with the notion, with our argument, that you cannot have workload caps, because the exclusive way of effectuating the management of the marketplace for MAC services, and the way the government is trying to do, is FAR 6.202. Is that exclusive? That's not exclusive to this. This is government-wide stuff. This tells every government agency this is the way you can manage the competitive concerns. Correct. For any procurement governed by the FAR, which would be nearly all procurements, then the exclusive way the government has in order to manage the marketplace for services in terms of restricting the amount of awards that someone who is otherwise eligible and capable can win, which we most certainly are. We have 19.8% as we stand here today. So the idea that somehow, because we're going to, we could cross 26%, we're somehow not eligible. That is the problem with the government invoking this eligibility and compliance with requirements provision. Yeah, yeah. But your argument is you could get 100%. And they couldn't stop you other than to go through this particular... Other than to go through this provision. And that's all they have to do. And presumably, if they have the goods in terms of being able to explain it, then indeed, that determination and finding would only be subject to a rational basis review. But the government has said, we can't come up with that. And so what we've done is, because we can't articulate a DNF that would survive a challenge, what we've done instead is create a bright line test. Thank you, Your Honor. May it please the Court. In its appeal, NGS effectively asked this Court to ignore the plain language of the statutory definition of full and open competition and second-guess the agency's business judgment in determining how to best fulfill its vital need for continuous, uninterrupted Medicare claims administration services. This Court should do neither. Instead, like the GAO and the Court of Federal Claims before it, this Court should deny NGS's protest and affirm the trial court's judgment. Don't the jurisdiction age limitations on their face vitiate full and open competition? No, Your Honor, because the statutory definition of full and open competition is that it means all responsible sources are permitted to submit sealed bids or competitive proposals. Isn't the hindering of competition post-submission still a hindering of competition? Well, we have to go with the statutory definition here, and no, it's not a hindering of competition because... Wait a minute. If the government adopted a rule like this workload cap, a policy that said, we're not giving contracts to women, but feel free to submit them, that's not hindering full and open competition? You can submit them. We're not giving the contract. Well, if the government's explicitly stating that you have no way to win and it's not based on the agency's needs... I mean, we have the discretion if no men come forward to give it to you. But it still has to rationally relate to the agency's needs, and I don't know how that would be in that case. Here, instead, the agency has a vital need for continuous, uninterrupted Medicare claims administration services, and one of the... So why didn't they do the rule? Why didn't they rely on the FAR provision and on 3303 or whatever the number is? There seems to be a statutory mechanism under which you're supposed to... Nobody's quibbling or arguing that the government should not try to pretend to be one single source if they could show if a breakdown would bring the whole system down unnecessarily, or the competitive thing, not let the little guys prosper because nobody's suggesting those aren't appropriate criteria. How could we? They're already enshrined in the statute. So why didn't the government just use that? Well, if the agency had wanted to exclude a particular source from the procurement, which is the language in 41 U.S.C. 3303, then it would have done that, and it would have had to follow the DNF procedure in the FAR. The agency is not excluding any particular source from this proposal. They're competing on the same evaluation criteria as everyone else. So is this argument you're making based on the fact that there's an exclusion? So if there were no exclusion, they can get it as a fallback of the reasonable? I don't know what you'd call it. There's an exclusion, right? There's a name for it. Exclusion of sources. Exclusion of a particular source is the... No, no, no. But you're saying there's an exception to this FAR. It's not a bright line FAR, 26% and you're out. The reason I think you're saying that there was full and fair competition is because there's this one circumstance under which they might be able to obtain the contract. That is one reason why there is. It goes beyond that, though. The agency had a particular reason for not just saying that if you have 26% at the beginning of the competition, you can't submit a proposal. These things can change over time, how much a particular entity has. Procurements in the ordinary course, they can last for many months, up to a year. I thought a lot of them in this area were 10 years. Well, I'm talking about the actual competition. In fact, some competitions have lasted... So you're arguing it's full and fair competition, even though if they lose on the 26% yard line, they're out of it. One day they may have 22% or six months later, while this is pending, they may have fewer. I don't know. So that's your argument for why this satisfies the full and fair competition. Our position is that it satisfies full and open competition because they're permitted to submit proposals and they're permitted to compete pursuant to the same evaluation criteria as everyone else, and they may in fact win the award. Whether it's because their position changes during the course of the procurement or because there's only one awardable proposal, whether it's because of responsibility, fair and reasonable price, whatever it is, there's full and open competition because they're allowed to submit proposals and they're allowed to compete. That's the reason there's full and open competition in this procurement. So you're saying this 3303 and the SPAR provision have no applicability because it deals only with excluding a particular source? Correct, Your Honor. Yes. How do we know? So excluding your view is you have to... This only means excluding them from even submitting a bid? I'm just trying to understand your argument. Well, we can look at two sources of statutory language here. One is 41 U.S.C. 107, so yes, that talks about the submission of proposals, but also 41 U.S.C. 3303 A1, an executive agency may provide for the procurement of property or services covered by Section 3301 using competitive procedures but excluding a particular source. So they're excluding the source from the procurement under 3303. So the agency has not excluded any sources from this procurement. It has no reason to invoke 41 U.S.C. 3303 at this time. So tell me again, you're saying this is different than what was contemplated here because we're letting them submit a bid and under unique circumstances they may even win at the end of the line because there's no other responsible bidder. So that means this provision doesn't apply? This provision is a source. It's a tool that the agency can use to permit other than full and open competition. Supposing the only submitting bidders exceed the cap? Well, in that case, the exception would certainly be both. Because there's no other responsible bidder other than one who exceeds the cap. Right, and they would have competed pursuant to the same evaluation criteria as everyone else, including the award limitation provision, and they would prevail under the terms. So you would use other criteria to determine which one? I think that's correct, Your Honor, the trade-off process that's used. So in this case, there's full and open competition and the court doesn't need to reach the question. I'm just trying to understand the point you were making about A1, 3303 A1, excluding a particular source. So you're saying this only applies when the government decides it's not even going to let somebody submit a bid. Like if you're at 26%, you don't bother bidding? Is that what you're saying this is limited to? Right, if the agency had said NGS, because you're at 19.8% now, you're excluded from the jurisdiction H procurement. They would need to justify that under 3303 A1. Don't you think this suggests a little bit of a gamesmanship, that the way to avoid going through these criteria is to let them file a bid, prepare a bid, go through the competition, even though they know at the end of the day, as long as there's one other responsible bidder, that 26% guillotine is going to come down? Well, what the agency is allowed to do then is create evaluation criteria that reflect its needs. So that's really the question in this procurement. I thought you had said in other places, this wasn't the evaluation criteria. They go through the evaluation and then at the end of the evaluation, this is part of the evaluation? Yes, it's in section M, which is entitled the evaluation factors for award. That's a standard section of solicitations. And it's something the agency has to apply in deciding who it's going to award the bid to. It is certainly one of the evaluation factors for award. And that's a position that we've taken throughout. Is there any other evaluation criteria that seems to be global and have nothing to do with the parameters of this individual solicitation? It does have to do with the parameters of this individual solicitation, Your Honor, because the agency has a vital need for continuous uninterrupted Medicare claims administration services in jurisdiction H. And that's threatened if a company becomes essentially too big to fail where the agency doesn't... We're going in circles now because their argument would be, well, yeah, that's exactly why we have 3303A. The agency does have a mechanism under which to preclude that. Nobody's arguing that those safeguards are necessary. The only question is how you get there. So you're saying here that in every solicitation under the evaluation criteria, you're including 26%? You're including what? Most of the max solicitations that have been issued since 2010 have included that provision. Under the evaluation criteria? I believe so, yes. I haven't looked at every single one of them. But yes, I believe they're all in section M. But of course, it includes the exclusion. Yes. The exception? Exception. Yes, yes. It would be essentially the same provision. One of the arguments that your opposing counsel makes is that basically the government just threw up its hands and said, we don't know how to do this. So we created this fallback. No, what the agency said, they applied this case-by-case basis approach during the first, I think it was about three or five years of the MAC procurements. And what they determined during this time was essentially that it didn't allow the agency to put in the solicitation the clear criteria that was going to determine whether or not somebody would be eliminated from the award. So they decided, we think we want to do these award limitation provisions that we considered initially when the Medicare Modernization Act was passed. They took that question to industry, and the response was very favorable. Some quibbled about what the percentage should be, particularly whether affiliates should be included and that sort of thing. But the agency took this to industry, and industry basically said, yes, this is a good idea. It allows the industry to know right up front what their position is going to be in the procurement, not have to guess whether or not the agency is going to exclude them because they've gone too high. I'm having a hard time talking about evaluation criteria and having this be among them because when I, obviously this isn't my field. I doubled down on what Judge Moore said about our level of expertise. But if you're, it seems to me you're comparing, you're drawing a comparison between offerers. Right. If you're dealing with evaluation criteria, which to me suggests if you've got one offer that's got 26% and another that's got 25%, this would be the evaluation criteria. One gets in and one doesn't. Is that how it works? So the agency puts criteria into its solicitation to exactly say who's going to get the, what the offers will be evaluated against. So yes, for this particular provision, if the offer exceeds 26% as a single contractor, then they will not be eligible for the award unless the exception comes into play, if they exceeded at the time of the award. There's other, and this is essentially a pass-fail criteria. You do not see the wisdom in the question. The wisdom in the question is back in the day prior to this, when it was one of many factors, one of the things the government could have looked at is this contractor's got 26% of all, but our next best guy has 25%. It's only 1% and this one's got a much better package that they're offering the government overall, so we shouldn't render them ineligible as a result of that. In the day when it was one of many factors, that was a very, that would have been a very rational approach. I think inherent in Judge Prost's question was, wait a minute, you're telling us that as an automatic cap, you're going to say no to the 26% person, despite the fact they might have a much more valuable and better proposal prepared for you, and it might be in the all the other bidders are at 25%. That's, I think, part of what is bothering me about this being a black-letter rule of sorts, rather than just one of many factors to be considered. But this gets into the broad discretion of the agency to create its evaluation criteria, and as we pointed out in our first Rule 28J letter, there can... You don't have the broad discretion to create evaluation criteria if it is inconsistent with FAR's full and open competition clause. You only have the requirements provision, right? So... If it's inconsistent with full and open competition, but the questions that I think are being asked here is, what's the best way for the agency to go about getting these max services? Shouldn't it be able to compare, I think your question was, shouldn't it be able to compare whether they have 27% or 28% versus whether they've submitted a $100 million lower proposal or something like that? And that could be a rational way to go about doing that, but the agency has the discretion to instead say, in the interest of transparency and in the interest of just saying 26% is too much, we've determined... And that was one of the... In determining the 26% number, that was one of the things the agency considered was... Did you take public input on that number? They submitted in the July 2010 RFI as well as the August 2010 RFI, so yes, and the 2015 RFI was considering that as well. So what the agency is basically saying is 26% is too much. If we look at the LMI report, it was effectively recommending a cap of 20.8% at that time, and one of the things the agency wanted to do in 2010 was say, well, we want offers to be able to at least the two largest awards. We could justify a lower cap perhaps than 26%, but in the interest of competition as well, that balancing test, the agency decided 26% was the right number. But that can change over time, right? If you don't have... If these contracts indeed go for 10 years, if you don't have the 26%, if you can meet that criteria, if you're at 24% at the get-go, then... And your contract... You can never compete through the term of that contract, but what if you have another contract that expires sometime within it, right? This is sort of a moving target, isn't it? It could be, and that's... I mean, it's possible that somebody could have that situation where five years into the contract, they might get below 26%, but we would still have five years where the threat to the continuity of the agency's vital Medicare claims administration services would be threatened. Did they all expire at the same time? No, it's a staggered process. But I'm still struggling with whether this is full and open competition. Can you help me by perhaps giving me other examples of policies like this, if they exist, that... I mean, because the whole reason... It seems like you've hung an awful lot on what feels like a very full and open competition, even though there's a rule that says we're not going to give to them unless nobody else qualified comes forward. I mean, that to me doesn't feel like full and open competition. That feels like backdoor bad stuff. I mean, I don't like the sound of that at all. So can you give me any other example where there are policies and that this is somehow relevant to the eligibility criteria, but nonetheless, they're not impeding full and fair competition? Is there any other example? The limiting rule here is that the provision, whether it's evaluation criteria or technical specifications, it has to be rationally related to the agency's legitimate needs. So we have lots of case law, like the CHE case, where the agency was combining hardware and software maintenance requirements, and there was only one company and its licensees that could perform the software side of it. So somebody that could do the hardware side came in and said, you're not providing full and open competition. You're unduly restricting that. And this court said, no, that's an unobjectionable because the combination is rationally related to the agency's needs. But they don't go to the ability to perform the contracted issue. This criteria does not go to the ability to perform the contracted issue at all. This criteria goes to sort of an agency-large macro view of the world of health Medicare administrative services. But those criteria go to ability to perform under an actual contract. And this criteria doesn't. But one of the agency's key needs is continuous uninterrupted Medicare claims administration services, not simply claims administration services while this company can do it, but continuously. And there's a provision specifically incorporated into the solicitation that provides that that NGS hasn't challenged. Let me ask you a question about the shifting numbers. Over time, people move. Say there's a substantial shift of people who are eligible for benefits from one region to another. And as a result, the percentages change. When does that kick in for recalculation? Is it done by the census or? I'm not sure when. In each solicitation, there's the list of the percentages that will be applied for that particular solicitation. So perhaps for the next one, maybe the numbers will be different. I don't know. But the agency could recalculate that basically when it deems it appropriate. So what I'm saying is if someone has a Region H contract, if the numbers drop in Region H, it could affect their eligibility in Region A. That's possible. Well, I say I've gone past my time. Unless the court has any further questions, respectfully request that the court affirm the trial court's judgment. Thank you. Thank you. The government hangs a lot of its argument on both the timing of the caps and whether or not the caps really operate as an exclusion in some broad sense or whether there is a large percentage chance that at the back end of this process, we can still win. But the record is extraordinarily clear. In fact, at Appendix 432 in the government's brief below, which is the government's brief at 20, the government agreed that we were unlikely to win the JH contract due to the workload caps before we had even submitted our proposal. Number two, there's a document at the appendix at 11.8.10 called the Klotz Declaration. It was a declaration submitted below by a CMS official that recounts in a 2014 GAO protest that NGS had filed at the GAO. The government argued that we were not even an interested party because the award of that contract would have caused us to exceed the caps. Let me ask you about the evaluation criteria. Do you agree that this is the way the government's using it as an evaluation criteria and doesn't that get removed? No, we do not. Well, the government shifts in at least three different places. Sometimes they argue that they are pass-fail technical criteria. Sometimes they have argued that they suggest that they're technical evaluation criteria due to the citation of CHE and other cases. But at least one point in their brief at page 39, the government concedes that the workload caps are not, quote, functional performance or design requirements. They have nothing to do with our ability to perform the contract or to ensure a reliable and continuous performing of the MAC contract. And is the way, the way I understand it works is they do everything until the end. So you get whatever normal evaluation you would get vis-a-vis the other offerers. And it's only at the end of the day, I guess, so once they determine, yeah, there's some other people left standing too, then they oppose the 26 percent? Correct. And to the point that Judge Moore asked about, we could be evaluated as the best value by far ahead of the pack and still be excluded. But still, there's a line at the bottom, right? Someone has to provide, be within certain criteria. It can't be that somebody is asking some astronomical amount of money. No, we... A responsible offerer has to be within certain criteria, right? No, Your Honor. According to these workload caps, if there is any responsible offerer that would be below the 26 percent cap, they would win. Yeah, but doesn't a definition of a responsible offerer include someone who meets some sort of reasonable costs? No. No, Your Honor. The responsibility goes to the ability to do the work, not to the best value evaluation. And in fact, that's why the government, it's brief at 37, which is Appendix 449. They point out that we argue that the caps are counterproductive because they may result in the offerer with the best value not receiving the award. And the government says, yeah, we were well aware of this possibility when we implemented the workload cap. So we could be the best combination of price and performance and still not win, even though the next best value offerer who would be below the caps would be ranked number five in a field of seven. Right. So how hard would it be for them to apply the 3303? I mean, you know, we all kind of understand at a visceral level, and they obviously did their homework and went off the comments, getting to this 26 percent. The suggestion is, which has a lot of appeal, right? If one person is controlling a lot of this market and they're hacked or something goes awry, everything falls, and it's responsible to try to guard against that, right? Yes. And that's our point, is that to the extent the government maintains that the workload caps are rational in this instance, they should be able to issue a DNF under 6.202. They say they can't, but they can't have it both ways. If 6.202 is too difficult to follow because they don't have the evidence in the record to support a determination and finding that they have not issued, then they should not be able to sustain the broader cap on the same basis. It's saying, well, why should we use a sharp tool when a blunt one will do? It makes no sense. They don't have the evidence for 6.202. The other thing that I think is an issue that Mr. Rayl raised is the timing of the — Well, if you're going to keep talking about it for time, I have some questions I want to ask you. Okay. Sorry, Your Honor. The reference you gave us to Appendix 449 indeed says where the government says, yes, we were well aware, but then it says we're concerned about antitrust, I'll call it that, antitrust implications. Somebody can capture the market and drive the smaller competitors out of business, and that's why we're willing to accept a higher-than-fair-value bid in that circumstance. And to the extent that the FAR is primarily concerned with the results of full and open competition, the FAR anticipates that there may well be offerors driven out of the marketplace as a result of full and open competition, but that if the government wants to protect against that eventuality, its remedy is in CICA and FAR 6.202, and they can address that no problem if they have the evidence in the record to sustain the determination and findings that was never issued here. Thank you, Your Honor. Thank you. We thank both sides for cases today that that concludes our proceedings.